Good morning and thank you, Your Honor. My name is Jaron Brom. I'm an attorney with Fenimore-Craig and represent the Arizona Cattle Growers' Association in this appeal. Initially, I'd like to reserve three minutes for rebuttal. May it please the Court, the U.S. Fish and Wildlife Service's 2004 final rule designating 8.6 million acres of critical habitat for the Mexican spotted owl must be remanded to the agency because the service's numbers simply do not add up. They don't add up to 8.6 million acres of habitat occupied by the spotted owl, and they don't add up to zero dollars in economic impacts for this critical habitat designation. Now, initially, I'd like to be clear that we do not argue that the service should not designate critical habitat for the spotted owl. What we do argue is that if the service is going to designate unoccupied habitat, it has to follow the procedures established by Congress and codified in its own regulations. Counsel, I guess you sort of defined the problem as being unoccupied territory, but I think the finding is that these are occupied, and what you're really doing is arguing with the findings with respect to that. Is that a way that the question can properly be framed? I believe so, Your Honor. The primary factual issue in this case is whether the service, in fact, designated unoccupied habitat as occupied critical habitat. You are correct that in the final rule they made the finding that all 8.6 million acres are occupied, but the fact is that the record does not support that determination. So this is really a substantial evidence review. At bottom, it's nothing fancier than that. I would agree. Yes, Your Honor. But it's important that the Court look at the record because the record demonstrates that the service designated millions of acres of unoccupied habitat as occupied. And I'd start principally with the recovery plan, which was adopted in 1995, which makes clear that these so-called restricted areas, which make up millions of acres of this final critical habitat designation, are in fact unoccupied. The service carried that science forward in the 2000 proposed rule. And if you recall, the 2000 proposed rule is actually what resulted in this final rule. It's the proposed rule for this final rule. So the proposed rule says the restricted habitat is unoccupied. The final rule says now it's occupied. And they don't explain that change in the final rule. The 2001 final rule designated unoccupied habitat based on the principle that a designation limited to occupied areas would not be sufficient. And even as late as March of 2004, in the draft environmental assessment for this very rule, the service called the restricted areas unoccupied. And four months before the final rule was adopted, was telling the public that these millions of acres of restricted areas are being proposed as unoccupied habitat. What's your definition of occupied? Well, it's not my definition. I think the word occupied is unambiguous. And we clearly argue that in our briefs, that Congress meant something when it distinguished between occupied and unoccupied. And at a very minimum, the service has to have some evidence that the species is present there. What do we mean by likely to be occupied? That's a good question. And the service did not make the finding in the final rule that the restricted areas were likely to be occupied. I want to make that absolutely clear. That's a post hoc rationalization of its counsel that, unfortunately, the district court adopted. The likely to be occupied language actually comes from the recovery plan and refers to protected areas, not restricted areas. So that's my question, really. I mean, say it's unambiguous. Occupied, I suppose, could just mean a nest. But I think everybody would agree, well, that's way too restrictive. If you just say, well, we'll designate the nest. Sure. So we've got to expand it from there. And so there has to be some sort of an artificial construct of what occupied means. And the important thing to remember is that the service did not define the term occupied in the final rule. So it's not entitled to deference for any post hoc offering of what that definition should be, because it did not adopt a formal definition in the final rule. What the service did say throughout the entire history of this rulemaking is that the PACs, the protected activity centers, are occupied. And that's 600 acres of the best owl habitat where owls are actually present. And it also said that the restricted areas are not occupied throughout the entire rulemaking. The only time they said they are occupied is in the final rule. And we believe that that's per se arbitrary and capricious, because the record says these areas are unoccupied. So their final determination is not supported by the record. And I would turn the court's attention to our home range argument in the brief. The service argues that this entire 8.6 million acres is occupied because it's needed to complete the entire life cycle of the species. Well, the service knows what those total acres are that are needed to complete the life cycle. And it's about 3,800 acres per PAC. So if you multiply the total PACs by the total home range area, you end up with, at a maximum, 4.5 million acres of critical habitat. So this is not a situation, Your Honors, where we're talking about a difference of a couple hundred thousand acres that could or could not be occupied. We're talking about half of this designation. The record doesn't support the occupancy determination. I'd like to turn briefly to the, unless there are questions on the occupancy issue, I'd like to turn to the economic analysis. Although the listing of a species is to be based entirely on biology alone, Congress has made clear that the service is to consider the economic impacts of designating a particular area as critical habitat. Here, we believe the service failed to give meaning to that requirement because it concluded, at the end of the day, that the designation of 8.6 million acres would have no economic impacts. That is nonsensical. If the habitat is truly essential to the conservation of the species and it really requires special management, that is, there are land use activities that must be some economic impacts from the designation. Now the service uses the doctrine of functional equivalence and the baseline approach to justify that zero economic impacts determination. And as this Court held in Gifford-Pinchot, the doctrine of functional equivalence, which assumes that critical habitat and that the benefits of critical habitat are the same as the benefits of listing a species, that principle no longer applies after Gifford-Pinchot. The adverse modification standard of critical habitat now has teeth, separated apart from listing. And the service ignored that distinction in doing the economic analysis in this case. Is it perfectly clear that they use the baseline analysis? In the final rule, it is, yes, Your Honor. In the final rule's economic analysis, they clearly state that the economic effects already in place due to listing of the owl as threatened is the baseline upon which we analyze the economic effects of the designation of critical habitat. That's at excerpts of Record 79. And they say, therefore, we concluded in the final analysis that no significant economic impacts are expected from critical habitat designation above and beyond that already imposed by listing of the owl. We need to make sure we distinguish between the baseline issue and the functional equivalence problem. You know, application of functional equivalence flies in the face of Gifford-Pinchot. It can't be reconciled. And the service recognized in its response brief before this Court that Gifford-Pinchot changed the regulatory landscape, but it didn't follow Gifford-Pinchot in the economic analysis. So if you then turn to the baseline argument, the service says, okay, we're going to look at what are the impacts of listing, and anything above that we're going to consider to be impacts of critical habitat. And since they've already been regulating unoccupied habitat through the recovery plan, they say there are no substantive economic impacts from the designation of critical habitat. Well, and they also rely on Gifford-Pinchot to support the fact that New Mexico Cattlegrower's case, which overturned or held that the baseline argument was unlawful, no longer applies because of Gifford-Pinchot, which I think are intellectually inconsistent. The service can't, on one hand, ignore Gifford-Pinchot and apply functional equivalence, and then on the other hand say Gifford-Pinchot resurrects the baseline argument because functional equivalence no longer applies. At the end of the day, there has to be some economic impacts from designating 8.6 million acres of critical habitat. The impacts simply cannot be zero. Unless there are any questions, I'd save the balance of my time for rebuttal. You certainly may do that. Thank you, Your Honors. We'll hear next from Mr. Oakley. May it please the Court. My name is Robert Oakley. I'm here from the Department of Justice on behalf of Fish and Wildlife Service. I'm splitting my time. I'm taking 12 minutes of the 15, and the remaining three will be taken by Mr. Fink, who represents the interveners in this case. Thank you. I'd actually like to take the issues in reverse order, because I think I'm going to spend most of it on Occupy, but I want to go to a couple of basic points or corrections that have to be made on how we calculated economic benefit. Yes, we used the baseline. No, the economic benefit or cost or impact of this designation is not zero. It is shown as being several hundred thousand dollars in increased consultations. It is shown as having some impact on grazing, which, of course, affects the Arizona cattle growers, and this is all contained in the final rule. So to say that it's zero is wrong. Secondly, it is also wrong to say that we are in conflict with Gifford Pinchot. What counsel omitted from his presentation is that the recovery plan developed in 1995 for the OWL is used as a basis for consultation by the service, and has been incorporated by the Forest Service and other agencies, but most particularly the Forest Service, which has five million of the eight million acres here designated as critical habitat. And so it is a binding obligation, and that's recovery plan, and I stress the word recovery because the problem Gifford Pinchot pointed out was that the service was, in effect, treating survival and recovery or reading recovery out of the statute, and, therefore, there would never be any economic consequences of designating critical habitat. Here there are. It may be that there are less here or fewer impacts because all the designations are on Federal land. None is on private land. But there are impacts. So those fundamental things, points, have to be looked at when you're considering our argument on economic impact. And one last thing. It simply makes no sense that the service should have to consider impacts that will occur regardless of whether it designates critical habitat or not. Why should the service exclude territory from critical habitat designation if those costs, that no cost would be saved by excluding it? Because if the cost of including it as critical habitat is the same or already, more importantly, already exists because the species has been listed, and it's not listed as critical habitat, no costs have been saved. Those costs are still there. Why should they be considered? The Cape Hatteras District Court decision, I think we got it right. It said logically the service should look at the world after the designation of critical habitat and see how that world has changed because of that designation. Now, going back to the occupied versus unoccupied argument, first, we think the service is entitled to deference on this because there's considerable, and I'm talking, there's both Chevron-type deference, but there's a deference of agency expertise. Chevron deference normally applies to a rule or a formal discussion or holding. Are you arguing that there is such a formal entity here, rulemaking, or something similar? No, I think, Your Honor, I would have to say that we'd have to fall back to Skidmore on this because, a Skidmore type of deference because while I looked hard at the rule, believe me, and there are places where this is mentioned, I don't know that this is the legal issues discussed enough so that the fact that the rule went through notice of comment, we get full Chevron deference. But there isn't or I shouldn't say there isn't, I should ask it as a question. Is there a place where we can look to see a coherent description of the definition of occupied and the rationale for making that definition? I think, Your Honor, if you look at Excerpts of Record, page 41, you'll come up with a discussion of the distinction between the PACs and restricted habitat, and that the concept is that the restricted areas are temporarily, meaning at times, occupied by the species, but they don't live there, they don't reside there. And this goes to the problem of applying a dictionary definition, which is written for people. I'm not suggesting you should apply any particular definition. I'm asking where we can find a statement that says, we, the folks with expertise, have made a decision about what occupied means and how we decide it. And here it is, and here's why we've done it, which would give rise to Chevron deference rather than something lesser. Well, I think one of the best discussions is on page, it starts on page 41, the third column of the Excerpts of Record, and the Fed Register site would be Volume 69, 53189. It's a response to a comment, and it points out that the designation includes both protected and restricted habitat, as described in the recovery plan. Everybody agrees that the PACs are occupied, but also people would agree that the PACs, which are based on less than 100 percent of the foraging area, don't fully address the problem. And then there's an explanation that appears on that page that goes on about restricted habitats, and that restricted habitats are considered to be temporarily occupied. And this is backed up in various places in the administrative record. These are also in the Excerpts of Record filed by the appellants, page 189 and page 191, where it says that these are areas that they use at times, but they don't permanently live there. They're believed to be occupied for purposes of Section 7 consultation. That's on page 189 of their Excerpts of Record. And again, it's from the administrative record in this case. The point being that the recovery plan and critical habitat is meant to provide for the recovery of these species, so it's not just enough to cabin off just enough land so that the birds that you absolutely, positively, completely know exist can live. But, for example, there's dispersal. When they have owlets, or that's when they're older, but when the birds leave, they disperse to another area, and there has to be area for them to complete that part of their life cycle. And so critical habitat is obviously not something that we can set out with specific meets and bounds, but it is, and no pun intended, it's an organic concept in that it's going to be changing and evolving over time as these birds shift. There are also floaters. I'm sorry. What is your specific response to opposing counsel's argument that using that definition, the record still only supports 4.5 million acres? Well, first, I would not say that using that definition, because that definition, what he did, and it was one of these back and forths. In their opening brief, they said the only thing that's really occupied are the packs. And we demonstrated why that was incorrect, and they gave up on that argument. And they came back and tried to use our argument against us, saying, all right, well, we'll take your numbers, multiply them out, and we can't come up with 8 million. Well, the reason is, in responding to why, we were only responding to why the packs weren't good enough. Their model doesn't take into account, for example, any dispersal. It's only, it's taking range for the known packs and doesn't take into account dispersal. And dispersal is obviously very necessary, the birds have to have somewhere to go if these birds are to recover, which is the goal of the Fish and Wildlife Service here. Get them off the list. So I guess what I'm hearing their argument to be, and they can speak for themselves, but I understood it to be that an area that will, in the future, be used because of dispersal can't count as occupied, even in the sense of temporally, you know, they eat here once a week. But if it's purely for later dispersal, it doesn't count as occupied. I suppose, well, I think they're, I think occupied should include, within the concept of the bird's life cycle, its offspring going somewhere. But to split your question up, I think the habitat would clearly be occupied if they were using it, even if they were, if some birds were using it, even if they were only using it once a week. Right. That, or once a year. I mean, but they are now using it at some point in their life. Yes. Presently. The presently existing creatures are using it at some time. Yes. Okay. I get that part. But are you also, including in this 8.6 million acres, areas that you know or that you can tell from the rule are used by the presently existing birds never, but it's your expectation that future generations would come to that place? Yes. There is evidence in that record. I think you could look at some handwritten notes on page 180 of the excerpt of record, and that is pointed as a justification for calling the area occupied. Not saying that they're permanent residents, but rather saying that dispersal will occur. There's also some seasonal migration. There are these so-called floaters, birds without any specific nest area that are moving around or unattached to a pair. They're not a pair of birds. Are there any owls, or have there been any owls in Kaibab North? Well, there were clearly some at some time, but eventually we did, you know, if I'm not confusing now the two ones that we're arguing about, the post-'90s studies didn't show those, but the service felt that those weren't good enough. I would point out that the service, the studies weren't good enough to be definitive on that point. I would point out that the service did exclude other areas where they just couldn't find enough evidence of the owls, that the original figure actually was over 13 million acres, and we dropped down to eight. So some of the comments on what the administrative record says have to be read in that context, that there was considerable dropping from the proposed rule to the final rule. And I'm cutting into Mr. Fink's time, but I just last — Not yet. I'm sorry. Not yet. Okay. Good. Good. Because he's very smart. And he'll help. But the owls — in fact, they excluded some areas where they actually knew there were owls. I mean, the owls still have the protections of the take provision under the Endangered Species Act, but the habitat was just too bad. They were too scattered. So this was not some blanket land grab by the service. And finally, it was all on Federal lands. It really wasn't grabbing anybody's land except the Federal governments. So if the Court has some other questions, I'll let you hear from Mr. Fink. Thank you. May it please the Court, my name is Mark Fink. I'm here today representing the Center for Biological Diversity, which intervened on this case on the side of the Federal defendants. And as we set forth in our brief, the Center's been working on this issue for close to 20 years now, trying to achieve adequate protection for the Mexican spotted owl and its critical habitat as required under the Endangered Species Act. And I think it's important to note that the Fish and Wildlife Service in this case was not looking at a blank slate when they started designating critical habitat back in 2004, but this has been a continuing story back to at least 1994. The species was listed in 93. So by 94, there was statutorily required to be critical habitat set aside to protect and recover this species. And so we've got a continuing saga that has been going on for a number of years. And on the occupied issue, we really have, you know, the two sides of the story is the Arizona cattle growers want to look only at the areas that are permanently occupied by the species with set nesting and roosting habitat, whereas the Fish and Wildlife Service looked at the definition of occupied in the context of biology of the species and recognized that if this species is going to survive and recover as required under the Endangered Species Act, you need to look for all of its life needs, which include not only nesting and roosting, but as federal defendants mentioned, also dispersal and foraging, and some of these birds migrate, and so you have to look at a much broader and comprehensive approach than simply the nesting habitat. I will speak only for myself, but the only part of occupied that causes me pause is the conscious designation, apparently, from what I've heard from the government, of areas that are thought to be areas of future dispersal for future generations, but that consciously, presently, are not occupied in the normal or have no birds in them right now, even for foraging, flying through, nesting, all of those different things that they do. That causes me concern, and specifically, I don't know how to pronounce it, but the North Kaibab Ranger District, whether there's sufficient evidence with respect to that area, and I know that's two questions in one, but if you could address those, I'd appreciate it. Certainly, Your Honor. On the first question, I think the trouble is, again, of trying to take a dictionary definition of occupied to match the complex biology of a species, and trying to do that in a snapshot of time, back in, you know, one day in 2004, where's the habitat that's occupied by the species, and it's certainly, it's just not possible to do that, and to be accurate. That's not actually what I'm asking, though. That's not at all what I'm asking. I'm asking if there are areas that, in which the service knows that, given the entire life cycle of the existing population of these owls, they do not come to area XYZ. They never have come to XYZ, but it looks like if they have enough offspring, the offspring will like XYZ a lot, and, you know, might disperse to that area in a future generation, but there's no evidence that they've ever been there yet, or in recent memory, that anybody can figure out. Is that a legitimate thing to include as occupied? That's apart from my question about that one area. Yeah, Your Honor, I do not think the record is adequate on that exact point, to know whether or not they were looking at areas that have never been used as dispersal before, but may be well in the future. What they might have been saying is that these areas are commonly used for other habitat needs, such as foraging and dispersal, and that are occupied under the Fish and Wildlife Service's definition of occupied for this particular species, because they're going to be required in the life cycle of this species. And again, it's really hard to take a snapshot of time and say, well, this area over here was only going to be used for dispersal somewhere down the road, but has never been used for dispersal before. I think it's, you know, they looked unit by unit through 52 units, using their expertise to determine, based on the habitat characteristics and their knowledge of the bird, which are most likely to be occupied by the species. And I think their determination is supported by the record on that. With respect to that one specific area, what does the record disclose? On the North Kaibab Ranger District, which is just north of Grand Canyon, there are survey results back in the 80s and the early 90s, showing that there were Mexican spotted owls there. And one thing I'd like to add to that is that, you know, I think it kind of shows how far down the rabbit hole we've gotten on this case, is that, you know, looking back from 1994, 1993, when the species was listed, to now 2009, really what the statute says is you're supposed to list the critical habitat for the species at the time that it was listed. So really, if you're going back to 1993, those sightings back in 1992 make a lot of sense. And, you know, my final point would be that the record acknowledges that the surveys since 1992 have not been comprehensive. And we would suggest that if they were more thorough and comprehensive, that perhaps some owls would still be found there. Should we give any significance to the argument of your opponent that all along in the evolution of the rule, these areas were considered unoccupied, and then suddenly they just turned into occupied areas? Your Honor, in my read of the record, again, we're looking at a number of years here. Back in 1995, when the recovery plan was put together, I think the term occupied was being used more in the terms of permanent nest sites. But then in the terms of critical habitat many years later, the recognition from the biologists was that, well, that's not what we mean by critical habitat. Because, again, here we're talking about what's necessary for the recovery of the species under the statute. And so we have to look at the entire life needs of the species. And I think the record is very clear that there is significant habitat used by the owl outside of those protected activity centers for other habitat needs. And that if you're going to bring the species to full recovery as required by the statute, you're going to need to encompass all of those habitat needs and not just the nesting and roosting needs of the species. If I could make just one more point, is that even the statute allows the service to designate unoccupied areas if they're essential for the conservation of the species. And one thing that I think really is important is that the time and time again in the record, the Fish and Wildlife Service makes clear that all of these areas are essential for the conservation of the species. Thank you, Your Honors. Thank you.  Thank you, Your Honor. Both of these issues, the economic analysis and the occupied unoccupied issue are important issues. And I'd like to begin briefly with the notion from government counsel that the recovery plan somehow shoves the impacts of designating critical habitat below the baseline. Even if you assume the baseline argument is valid, which was thrown out in New Mexico cattle growers, does the recovery plan shove the impacts of critical habitat below the baseline? And the answer is simply no, because compliance with the recovery plan is voluntary. Recovery plans are not binding documents. They're guidance documents. They have no substantive regulatory impacts. They say, here's the best habitat out there. Here's what we'd like to do. Here's what the optimal things to do are. In contrast, critical habitat must be essential to the conservation of the species. Not just helpful towards recovery. Not just aiding in recovery. It has to be essential to the conservation of the species. So to say that what was one time voluntary now becomes mandatory, shoves the economic impacts of the mandatory adverse modification requirement below the baseline, I think is per se arbitrary and capricious. There are real impacts from imposing critical habitat on these lands. And if there weren't, it wouldn't be essential to conserve them to designate it as critical. Council, what is your response to the final point that was made by the interveners council that the definition of something as unoccupied doesn't necessarily mean that it cannot be included if it is essential for the survival and recovery of the species? The services regulation requires that they first look at whether all occupied areas, a designation limited to occupied areas would be sufficient to ensure the conservation of the species. And here, they didn't do that. They didn't make that initial finding because they assumed that all 8.6 million acres were occupied. At the same time, I think your honors can understand that. They didn't assume it, they found it. Whether they found it with sufficient evidence is a different question. Right, right. But for the purposes of the essentialness of that habitat, they made the determination it was occupied. Whether habitat is essential to the conservation of the species is a big difference between occupied and unoccupied habitat. So just because they found all 8.6 million acres as essential doesn't save their failure to analyze what they were supposed to analyze to designate unoccupied habitat. And I'd like to get into that occupied issue if I could. Council, for the government, once again ignored our argument on the home range and that the data, the numbers simply don't add up. At the end of the day, the service knows how many owls there are. They've got extensive data on the species. They know that at a maximum, an individual pack needs about 3,800 acres to complete its entire life cycle needs, including dispersal habitat. So if you multiply the 1,200 packs that exist by the 3,800 acres, that's the 4.5 million acres. What's the explanation for the additional 4.1? There isn't one. There is no explanation for that. And to answer the court's question on whether dispersal habitat was included in this designation, and indeed was, and I would point the court to ER 0061, where the court said, or where, I'm sorry, where the agency said, in describing restricted habitat, these areas are used by resident owls for foraging, since the 600 acres recommended for packs include an average of 75% of lifetime foraging locations of radioed birds. The restricted areas also provide habitat for non-territorial floaters, comma, to support dispersing juveniles, comma, and to provide replacement nest roost habitat on the landscape through time. So it includes both dispersal habitat and replacement habitat. And I don't think there's any question about that from the record. The other point I'd like to make on the occupied, unoccupied issue. But from what you've just described, the areas, the quote that you gave was not of an area in which the territory wasn't also used for foraging and floater birds and other things. I don't think that quote is all-inclusive, Your Honor. I think it's some of the areas are used for foraging, some of the areas are used for dispersal, some of the areas are used for new nesting areas. And on the foraging issue, you know, the only basis to designate the areas outside the packs is foraging. And the recovery plan makes clear and the service makes clear in this final rule that that 600-acre pack makes up 75% of the needed foraging habitat. So the other 25% comes from 7.9 million. That's where we're looking at this record saying these numbers just don't add up. And that's consistent with the service's treatment of the restricted habitat for over a decade as unoccupied habitat. What is your response to the assertion that what really needs to be looked at isn't the present day, but the date on which the owl was listed? The courts have never really addressed that issue. And at the end of the day, our response would be in 1993, the service was treating the restricted areas as unoccupied. They were treating it as unoccupied in 1993 until August of 2004 when this final rule was issued. And I would point the court, and unfortunately, the draft economic or environmental assessment did not get into the record, but table 5 on page 29 makes clear that the occupied habitat in region 3 of the Forest Service makes up 643,000 acres of the proposed designation and quote, unoccupied habitat makes up 5.4 million. That's four months before the service issued the final rule converting everything to occupied habitat. So, and just to sum up, on the issue of substantial evidence, the service did not explain that change in the final rule. There's no explanation whatsoever for calling these restricted areas from converting it to unoccupied to occupied. And that's a significant difference in the eyes of Congress when they designated, defined critical habitat in 1978. If there are any other questions, I'd be happy to answer them. What I'd like to do, because the draft EA was not in the record, and I think it's important for the court to see that document, I'd like to submit it under 28J or submit it to the court for disbursement. If this is part of the record, you'll need to file, if it's other than a legal citation to a published case, you'll need to file a motion and give the other parties an opportunity to respond to the appropriateness of your additional materials. And it's part of the administrative record? It just was not included in the excerpts of record? If it's already part of the record record, we have it. No, it's not in the excerpt of record? No, I understand that. We have the opportunity, I think we have the whole record already. This is just sort of generically for anybody who's listening. We have the whole record in every case. Not just what's listed in the excerpts. The excerpts are for our convenience, but they don't limit what we look at or review. Great. So if it's redundant, you don't need to do it. If it's additional, you'll need to make a motion. It's not in the administrative record. There's sort of no point. It's considered because we don't want it. Right. No, it is in the administrative record. So I encourage the court to take a look at it, and I thank you for your time. Thank you. The case just argued is submitted.
judges: Fletcher B. , Canby, Graber